UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
THEODORE SMITH

           Plaintiff,

        -against-


*THE NEW YORK CITY DEPARTMENT OF*          <u>**AMENDED COMPLAINT**</u>
EDUCATION, JOEL I. KLEIN MICHAEL LA FORGIA,
TIMOTHY TIMBERLAKE, VICTOR RAMSEY,      06 Civ. 4613(NRB)
LINDLEY UEHLING, THERESA A. EUROPE
FRANCESCA PENA, DARLENE MILLER, and
FAY PALLEN,
INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES
AS EMPLOYEES OF THE NEW YORK CITY DEPARTMENT
OF EDUCATION, , RICHARD CONDON,
GERALD P. CONROY and MICHAEL HUMPHRIES,
Individually and in their capacities as Members of the New York City
Special Commissioner of Investigation,
DAVID KEARNEY,


           Defendants.
--------------------------------------------------------------x

      **COMES NOW**, Plaintiff Theodore Smith ("**Smith**"), by and through his undersigned

counsel, The Law Offices of Robert S. Lewis, P.C., located at 53 Burd Street, Nyack,  New York

109609, and as and for his Complaint against the New York City Department of Education (the

"**DOE**"), Joel I. Klein("**Klein**"), Michael LaForgia ("**LaForgia**"), Timothy Timberlake

("**Timberlake**"), Victor Ramsey ("**Ramsey**"), Lindley Uehling ("**Uehling**"), FRANCESCA

PENA("Pena"), DARLENE MILLER("Miller") and FAY PALLEN("**Pallen**") THERESA

EUROPE("**Europe**"), Richard Condon("**Condon**"), GERALD P. CONROY("**Conroy**"), and

MICHAEL HUMPHRIES("**Humphries**"), and DAVID KEARNEY ("**Kearney"**)(hereinafter

collectively "**Defendants**" or "**defendants**") states and alleges as follows:

## NATURE OF THE ACTION

1.    This is an action seeking compensatory and punitive damages, costs and attorneys' fees against the Defendants for disability discrimination, age discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 ("**ADA**"), 42 U.S.C. § 12101 *et seq*., the Age Discrimination in Employment Act of 1967 ("**ADEA**"), 29 U.S.C. § 621, a violation of 42 U.S.C. § 1983, as well as applicable New York State and New York City Human Rights Laws. Additionally, Smith asserts State-law claims for libel, as well as for discrimination based on his exercise of lawful, protected activities protected under the National Labor Relations Act in violation of Section 201(d) of the New York Labor Law.

2.    Smith alleges that Defendants (1) denied his requests for reasonable accommodation under the ADA; (2) discriminated against him based on his status as a disabled person; (3) discriminated against him immediately after he attained the threshold age of forty (40) years; and (4) retaliated against him as a direct result of his complaints, including, but not limited to, formal grievances he filed with the teachers' union, concerning defendants' discriminatory treatment and refusal to accommodate his disability under the ADA. Smith, who suffers from a heart condition, maintains that despite ten (10) years of uniformly positive performance reviews and observations by DOE officials, he became the target of a campaign of discrimination and harassment immediately following his health-related requests for classes that did not exceed DOE class-size limits,[1] as well as for minor changes to his teaching schedule in order to accommodate treatment of his medical condition.

---

[1] The inherent reasonableness of a teacher's request that the DOE abide by existing and enforceable class-size restrictions should be apparent on its face. It is only in recognition of the reality of overcrowded schools that the Plaintiff considers any request that the DOE actually abide by the restrictions---as explicitly provided in its collective bargaining agreement with the teachers as well as State and City mandates---an "accommodation" at all.

3.    Specifically, Smith was directed to teach classes of in excess of sixty-five (65) students at a time, far in excess of the limits imposed on the DOE by State mandates and by the Collective Bargaining Agreement ("**CBA**") in force and effect between the DOE and the teachers' union. When the large class sizes began to adversely affect Smith's health and exacerbate his existing medical condition, he requested smaller classes in accordance with his physician's recommendations.

4.    Instead of fixing the problem, the DOE turned its attention instead to scrutinizing Smith's attendance. Smith's physicians, however, confirmed what the DOE already knew: that his occasional absences from work were necessary for purposes of treating his disability. Smith submitted medical documentation substantiating that he was in fact either hospitalized or under the supervision of his treating physician when absent. Additionally, the DOE's **own** physicians corroborated the findings of Smith's doctor. Smith's requests for reasonable accommodation, however, not only were refused outright but also met with disparate overbearing supervision, contrived negative performance evaluations, false letters of reprimand, suspension, threats of termination, a barrage of exaggerated and trumped up charges resulting in numerous hearings under New York Ed. Law §3020(a) hearings, harassment, and a concerted effort as demonstrated by a well organized conspiracy among employees of the DOE and the Office of the SCI, specifically designed and intended to tarnish his name and reputation, and ultimately, to drive him from the New York City School System and to block other opportunities for employment in the education field, as a teacher or as an administrator.

5.    In one instance, DOE employees exchanged e-mail communications, which were inadvertently sent to Smith, expressly inquiring as to what could be done to drive Smith from the DOE.

6.      Smith further alleges that, immediately following his filing of formal complaints, including, but not limited to, Union grievances in accordance with procedures provided by the CBA---and protected under the NLRA---concerning discrimination and harassment against him, defendants further retaliated against him by rendering his work environment hostile and intolerable by manufacturing almost daily false negative performance reviews of his teaching and fanciful allegations of insubordination and incompetence against him. Defendants then used these utterly false accusations as a pretext to suspend Smith and have now instituted New York Ed. Law § 3020(a) proceedings in an attempt to terminate him, all in flagrant violation of the anti-retaliation provisions of State and federal civil rights laws, as well as § 201(d) of the New York Labor Law.

7.    Employees of the New York City DOE embarked upon a plan and conspiracy to engage in conduct designed and intended to retaliate against and harass Smith, and to find any incident of non-compliance with DOE rules and regulations, regardless of how trivial or de minimus, contrary to the provisions of New York Civil Service Law § 75-b, otherwise known as the "Whistleblowers Law".

8.  Despite having already served the one year suspension imposed upon him, and as part of its continuing campaign to remove him from the New York City School System, Smith remains a charter member of the Rubber Room (or Reassignment Center in DOE parlance) unable to teach in the DOE or to obtain any other position in the field of education, because Smith's personnel file has been blocked by the DOE, and is unable to be released to any prospective employer.

9.   After the DOE's efforts to drive Smith from the DOE had failed, the DOE published a false and defamatory report alleging that Smith had threatened an arbitrator, which falsified report was disseminated to the news media and on the internet.

10.   The DOE has also created further false and bogus charges of absenteeism by deducting from Smith's present paychecks, amounts paid to him several years ago, only now claiming that Smith had actually been absent during the time for which he had been paid.

11.   The DOE had attempted to actually create bogus charges of absenteeism against Smith by not providing his time card so that Smith was unable to punch in each day when he reported to the Rubber Room as required. Smith was given a substitute card to use for three days, after which the "official" time card appeared.  Smith used that card for the remainder of the month.  Thereafter, Smith received a check for $105.00 for the month of June along with a copy of the time card for June 1, 2 and 3, 2009, along with a note upon the card stating that the time card shows deductions for the entire month of June other than the first few days, the official time card having been concealed by the DOE.   The real card was only "discovered" after Smith and his attorney complained to counsel for the DOE and threatened further legal action.

12.   Not surprisingly, the DOE actually deducted from Smith's paycheck amounts for which had not even been paid during his suspension, thus "double deducting" Smith's pay.

## PARTIES

13.   Theodore Smith is, and was at all times relevant hereto, a Citizen of the United States, residing at 2 Sutton Place South, Apartment 10G, New York, New York 10022. He is a 49-year-old Physical Education teacher, with tenure, employed by the DOE.

14.   Upon information and belief, the New York City Department of Education is, and was, at all times relevant hereto, Smith's employer. The DOE is an administrative department of

the City of New York, which itself is a municipal corporation and political subdivision of the State of New York and hence subject to the laws and statutes of the United States and of the State of New York.

15.    Upon information and belief, Michael LaForgia is, and was, at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New York. LaForgia served as the Local Instructional Superintendent at all times while Smith was employed as a tenured physical education teacher by the DOE. In that capacity, LaForgia qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because he could control the terms and conditions of Smith's employment, including, but not limited to, his compensation, the production and maintenance of employment records, scheduling, and the ability to hire and fire him. Additionally, LaForgia oversaw, and directly participated in, the discriminatory and/or retaliatory conduct at issue in this case and hence alternatively qualifies as an "employer" under § 296(6) of the Executive Law by virtue of his direct participation in the discriminatory and retaliatory acts alleged.

16.    Timberlake is, and was at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New Jersey. Timberlake served as the Principal of Chelsea High School while Smith was employed as a physical education teacher at Chelsea High School. In that capacity, Timberlake qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because he could control the terms and conditions of Smith's employment, including, but not limited to, his compensation, the production of performance evaluations that affected compensation and continued employment, the maintenance of

employment records, scheduling, and the ability to hire and fire him. Additionally, Timberlake participated directly in the discriminatory and/or retaliatory conduct at issue in this case and hence alternatively qualifies as an "employer" under the § 296(6) of the Executive Law by virtue of his direct participation in the discriminatory and/or retaliatory acts alleged.

17.     Ramsey is, and was at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New York. Ramsey served as the Regional Fitness and Physical Education Director for the Department of Education and was brought in to oversee and supervise Smith during his employment as a tenured physical education teacher. In this case, Ramsey qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and under New York City Administrative Code §§ 8-107 and 8-502 because he could control the terms and conditions of Smith's employment by drafting evaluations and observations that would affect his continued employment, his compensation and his eligibility for benefits. Ramsey alternatively qualifies as an "employer" under the § 296(6) of the Executive Law by virtue of his direct participation in the discriminatory and/or retaliatory acts alleged.

18.     Uehling is, and was at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New York. Uehling served as the Principal of the New York City Museum School while Smith was employed as a tenured physical education teacher there. In that capacity, Uehling qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because she could control the terms and conditions of Smith's employment, including, but not limited to, his compensation, the production of performance evaluations that affected compensation and continued employment, the maintenance of

employment records, scheduling, and the ability to hire and fire him. Additionally, Uehling participated directly in the discriminatory and/or retaliatory conduct at issue in this case and hence alternatively qualifies as an "employer" under the § 296(6) of the Executive Law by virtue of her direct participation in the discriminatory and/or retaliatory acts alleged.

18(a).    Pena is, and was at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New York. Uehling served as the Superintendent of Manhattan High Schools while Smith was employed as a tenured physical education teacher there. In that capacity, Pena qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because she could control the terms and conditions of Smith's employment, including, but not limited to, his compensation, the production of performance evaluations that affected compensation and continued employment, the maintenance of employment records, scheduling, and the ability to hire and fire him. Additionally, Pena participated directly in the discriminatory and/or retaliatory conduct at issue in this case and hence alternatively qualifies as an "employer" under the § 296(6) of the Executive Law by virtue of her direct participation in the discriminatory and/or retaliatory acts alleged.

19.    Klein is, and was at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New York. Klein served as the Chancellor of the Department of Education and oversees all operations of the DOE and its employees, agents and representatives. In this case, Klein qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and under New York City Administrative Code §§ 8-107 and 8-502 because he could control the terms and conditions of Smith's employment by overseeing the drafting of evaluations and observations that would affect

his continued employment, his compensation and his eligibility for benefits. Klein alternatively qualifies as an "employer" under the § 296(6) of the Executive Law by virtue of his direct participation in the discriminatory and/or retaliatory acts alleged.

20.  Condon is, and was at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New York. Condon served as the Special Commissioner  of Investigation and oversees all operations of the SCI and its employees, agents and representatives.

21.   Conroy is, and was at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New York. Conroy served as the for the Deputy Commissioner for the Special Commission of Investigation and oversees all operations of the SCI and its employees, agents and representatives in connection with the preparation of its investigative reports.

22.   Humphries is, and was at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New York. Humphries served as an Investigator for the Special Commission of Investigation and oversees all operations of the SCI and in connection with the preparation of its investigative reports.

23.   Europe is, and was at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New York. Europe served as the Deputy Counsel to the Chancellor of the DOE and supervises and oversees its employees, agents and representatives and is directly involved with the overseeing its investigations. In this case, Europe qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and under New York City Administrative Code §§ 8-107 and 8-502 because she could control the terms and conditions of Smith's employment by overseeing the drafting of

reports that would affect his continued employment, his compensation and his eligibility for benefits. Europe alternatively qualifies as an "employer" under the § 296(6) of the Executive Law by virtue of her direct participation in the discriminatory and/or retaliatory acts alleged.

24.    Miller is, and was at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New York. Miller served as the Principal of the Museum School and supervises and oversees its employees, agents and representatives and is directly involved with the operation of the Museum School. In this case, Miller qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and under New York City Administrative Code §§ 8-107 and 8-502 because she could control the terms and conditions of Smith's employment by directly overseeing his performance and the drafting of reports that would affect his continued employment, his compensation and his eligibility for benefits. Miller alternatively qualifies as an "employer" under the § 296(6) of the Executive Law by virtue of her direct participation in the discriminatory and/or retaliatory acts alleged.

25.    Pallen is, and was at all times relevant hereto, a Citizen of the United States and, upon information and belief, a resident of the State of New York. Pallen served as a Mentor to Principals and supervises and oversees DOE employees, agents and representatives such as its Principals and is directly involved with the policy making and decisions of Principals serving in the DOE. In this case, Pallen qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and under New York City Administrative Code §§ 8-107 and 8-502 because she could control the terms and conditions of Smith's employment by directly overseeing his performance and the drafting of reports that would affect his continued employment, his compensation and his eligibility for benefits. Pallen alternatively qualifies as an

"employer" under the § 296(6) of the Executive Law by virtue of her direct participation in the discriminatory and/or retaliatory acts alleged.

**JURISDICTION AND VENUE**

26.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 in that the claims herein arise under the laws of the United States, and in particular under the Americans with Disabilities Act of 1990 ("**ADA**"), 42 U.S.C. § 12101 *et seq*., as amended, the Age Discrimination in Employment Act of 1967 ("**ADEA**"), 29 U.S.C. § 621, as amended, as well as the Civil Rights Act of 1871, 42 U.S.C. § 1983.

27.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's State law claims for defamation, for violation of the New York Labor Law, as well as for those claims arising under New York Executive Law § 296 and under the New York City Administrative Code §§ 8-107 and 8-502.

28.     Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because the defendant entity resides, for purposes of venue pursuant to 28 U.S.C. § 1391(c), in this judicial district and because a substantial part of the events giving rise to the claims herein occurred in this judicial district.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

29.     On or around October 28, 2005, well within the mandated 300-day period, the Plaintiff filed a charge with the EEOC alleging that he was the victim of illegal discrimination and retaliation and that his rights under the ADA, the ADEA and/or Title VII of the Civil Rights Act of 1964 had been violated. On or about April 10, 2006, Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC") in connection with this charge. This action is filed within ninety (90) days of plaintiff's receipt of said Notice of Right to

Sue from the EEOC. (A copy of the right to sue letter is attached hereto and made a part hereof as **Exhibit A**.)

## FACTUAL BACKGROUND

30.     In or around 1992, Smith was diagnosed with paroxysmal atrial fibrillation and accompanying atrial flutter, a form of supra ventricular tachycardia. He continues to suffer from this condition and, as such, qualifies as an individual with a "disability" within the meaning of the Americans with Disabilities Act.

31.     In or around September of 1995, Smith was hired as a physical education teacher for the New York City school system. From the outset of his employment, Smith performed his duties extraordinarily well. As a result, he was awarded tenure in 1999 and for ten (10) years received consistently positive performance evaluations.

32.     Notwithstanding his disability, Smith has, and continues to be, fully able to perform the essential functions of his job. He has, nevertheless, required reasonable absences for purposes of monitoring and treating his condition, and at all times submitted appropriate medical documentation and arranged for a substitute teacher when absent.

33.     Initially, Smith was assigned to the Beacon School but later accepted a position and administrative internship at the High School of Art & Design, where he worked while completing his administrative license at Fordham University. Thereafter, Smith received transfer to Chelsea High School as a physical education teacher and, finally, accepted a supervisor's Phys Ed/health position at the Museum School, with the promise of promotion to assistant principal.

34.     Smith's employment history speaks for itself. From 1995 to 2001, Smith worked for the Beacon School, receiving satisfactory ratings for each of the six (6) years he taught at Beacon. At the High School of Art & Design, Smith received the highest possible praise and

performance ratings. After turning forty (40) years old in November of 2001, Smith articulated his intent to pursue a career in administration and, after obtaining the necessary educational qualifications and certification during his tenure at Fordham University/Art & Design School program, accepted a transfer to Chelsea High School under its principal, defendant Timberlake.

35.    Smith began working at Chelsea High School in the fall of 2002. When Smith articulated, and exercised, his physician's advise that he take occasional absences for purposes of submitting to medical appointments for purposes of treating his health condition, Timberlake began harassing Smith.

36.    Specifically, in January of 2003, Timberlake told Smith that "you are never going to be an Assistant Principal because you have been out too many times." Smith protested that his only absences were those related to the treatment of his heart condition and that he was being treated unfairly on account of his disability. The harassment, however, only intensified as Smith continued to complain of unfair and illegal treatment.

37.    Moreover, on January 3, 2003, March 6, 2003, May 21, 2004, and May 24, 2004, Timberlake issued formal letters of reprimand, threatening Smith with an unsatisfactory rating and/or termination due to Smith's health-related absences. At all relevant times, however, Timberlake was aware that Smith had a medical condition and required occasional absences to care for this condition because, in addition to his telling Timberlake about his condition at the outset of his employment at Chelsea, Smith supplied medical documentation explaining his absence and detailing his treatment in accordance with DOE procedures.

38.    When Smith finally requested a transfer to another school in June of 2004, Timberlake told Smith that Smith would not be able to get a job in any other school as an administrator because Timberlake would "give [Smith] a bad reference." Throughout this period,

Timberlake kept threatening to fire Smith because he had been absent, despite numerous letters and diagnostic reports submitted to Timberlake by Smith's physician, explaining Smith's need for infrequent hospitalization and/or outpatient treatment.[2]

39.    However, prior to the beginning of the school year, Smith applied---and was accepted for---a position with an experimental pilot school called the New York City Museum School in or around August of 2004.

40.    Upon information and belief, the Museum School was having difficulty retaining physical education teachers in part because it housed a mixed group of middle school and high school students, did not have a functional gymnasium and was totally devoid of safety equipment. These problems compounded the inherent challenges to discipline and order which plague any physical education class involving adolescents.

41.    Upon commencement of his employment with the Museum School in September 2004, Smith was directed to teach classes in excess of sixty-five (65) students at a time, far in excess of the 50-student maximum provided by the regulations. He discovered immediately that there was no gymnasium, no regularly scheduled meeting space and no safety equipment.[3] Nevertheless, Smith attempted to work through the challenges at the Museum School and was well-received by its Principal, Lindley Uehling. Uehling acknowledged the poor conditions and pledged additional personnel and resources, and evaluated Smith positively.

---

[2] According to the letters of reprimand, Smith was absent a total of 9 times during the 2003-2004 academic year, and had 6 partial absences for purposes of attending medical appointments. All in all, Smith's absences totaled 12 "full days," according to the May 24th letter of reprimand, exceeding the contractual allotment of 10 sick days per healthy, non-disabled teacher by only 2 days.

[3] Students were sent to physical education in groups of 65, or approximately 400 students meeting approximately once a week. It is noteworthy that Principal Uehling would later criticize Smith for not getting to know all of the students on a first-name basis.

42.     Despite Smith's efforts, the stress of managing both middle school and high school age groups under basically unmanageable circumstances began to affect his health after several months. A teacher's assistant was injured, resulting in Smith's written complaints that safety was a concern.

43.     In or around November of 2004, Smith complained to Principal Uehling about oversized classes and the lack of promised---but never delivered---support, conditions that he believed were endangering his students and exacerbating his medical condition. No action was taken in response to Smith's complaints. Instead, immediately following Smith's complains about the dangerous and overcrowded conditions and lack of support, Uehling began to give him frequent "unsatisfactory" classroom evaluations and threatened him that if any "real" injuries occurred, it would "reflect very badly" on Smith.

44.     Throughout this period, Smith made numerous complaints to Defendant LaForgia, requesting intervention for his complaints of disability discrimination and retaliation. His complaints went unanswered, and LaForgia did nothing to put an end to the harassment.

45.     In or around January of 2005, Uehling, tired of taking heat for Smith's complaints, wrote to LaForgia's office, asking for advice as to how to "get rid" of Smith. Uehling sent a forwarded e-mail from Smith, detailing his health-related concerns over class size, which contained Smith's home e-mail address.

46.     On January 29, 2005 at 7:26 AM, Smith received an e-mail from Fay Pallen, an administrative staff support employee with LaForgia's office. The e-mail was in reply to

Uehling's message and obviously intended as a confidential communication to Uehling. It was, however, sent to Smith's home e-mail account from Pallen's T-Mobile Blackberry device.[4]

47.    The e-mail bore the subject heading "Ted" and explained that the way to "get [Smith] out" is to have defendant Ramsey write negative evaluations and to give Smith two unsatisfactory annual performance reviews.

48.    On Wednesday of the following week, February 2, 2005, Defendant Ramsey appeared for a classroom observation and evaluation. As pre-determined by LaForgia and his staff, the evaluation was overwhelmingly negative. When questioned in writing as to why Ramsey had submitted a negative written evaluation after telling Smith that the class was "great," Ramsey quickly retracted the evaluation and updated the "salient points" inadvertently left out of the initial evaluation. Uehling was thwarted, at least for the moment.

49.    Infuriated by the retraction, Uehling ordered Ramsey to return to Smith's classroom for a second "evaluation" session. Smith, understanding the situation for what it was in light of Pallen's inadvertent e-mail transmission of January 29, 2005, immediately prepared an Article 23 Harassment Grievance with the United Federation of Teachers ("**UFT**"), which he filed on March 7, 2005.

50.    Following the grievance, on or about March 23, 2005, [5]Smith submitted a letter to LaForgia, Uehling and Ramsey, which set forth a complete explanation of his disability and requested a reasonable accommodation for purposes of managing his health. Specifically, Smith requested a scheduling modification whereby he could occasionally take full or partial days

---

[4] It has been said that the Lord works in mysterious ways. Apparently, such channels also include the inadvertence, oversight and incompetence of the DOE. It is frightening that these individuals have been charged with educating the next generation of American youth, especially in light of the fact that most of the correspondence placed by administration in Smith's personnel file is barely literate.

[5] Notwithstanding the letter of March 23, 2005, the DOE was well aware of Smith's disability during the fall 2004.

absences to obtain necessary medical care for his heart condition. This letter was accompanied by a verification from Smith's physician dated March 10, 2005. Although the diagnostic opinion as articulated by Smith's physician confirmed the existence of Smith's disability, it specifically stated that Smith "can certainly fulfill all of the requirements of his job position and appears to be a very competent individual."

51.    Almost immediately after Smith's March 7th grievance, the defendants upped the ante and began a full-blown campaign of discriminatory and retaliatory harassment. On March 21, 2005, Uehling sent Smith a letter threatening him with termination and an "unsatisfactory" rating.

52.    On or about April 5, 2005, Ramsey came through with the negative letter as prescribed by Pallen in her January 29th e-mail, falsely accusing Smith of "unprofessional" conduct, "irresponsibility" and a lack of motivation and effort. In addition, Ramsey criticized Smith's absences even though Ramsey knew at all relevant times that Smith had a condition that made such absences medically necessary.

53.    On that same day, Smith was directed to attend a DOE medical examination on April 28, 2005. On or about April 7, 2005, Smith explained that he could not attend the examination on the scheduled date because his Union representative was unavailable to accompany him on account of the fact that it fell during a district-wide vacation period.

54.    In response, Smith was directed to attend a second medical examination scheduled for May 24, 2005 by the medical examinations department. Smith asked for an explanation as to why he was required to submit to an examination and was told that there were documents in his file, submitted by Uehling and endorsed by LaForgia, detailing a pattern of absences giving rise to an inference of fabrication of his condition---documents to which Smith

had not been privy. Smith demanded to see the documents in his file before submitting to any examination, and he explained to Uehling that unless he was given access to the documentation, the examination, based on maliciously false accusations that he had fabricated his illness by Uehling, violated his due process rights and that he would not attend.

55.     Smith filed a second grievance with the UFT on May 5, 2005, as well as numerous other grievances on May 18, 2005, demanding that he be allowed access to his file and that the discrimination and harassment against him immediately cease. Uehling responded by charging him with insubordination on May 26, 2005 and threatening to remove Smith from the payroll.

56.     On or about June 6, 2005, Smith was removed from the payroll pursuant to Uehling's direction.

57.     In an effort to put an end to this course of discriminatory and retaliatory harassment, Smith forwarded a second letter from his physician on June 8, 2005. This letter detailed Smith's medical condition, but again confirmed that he was fully able to perform the essential functions of his job. This letter also stated that Smith's atrial fibrillation had occurred much more frequently in the preceding months and indicated that crowded classes and consequent hazards were a contributing factor. Notwithstanding this second letter, the course of discriminatory and retaliatory harassment continued and, as usual, nothing was done to remedy the oversized classes.

58.     On or about June 17, 2005, Smith received an "unsatisfactory" performance rating from Uehling; it was the first unsatisfactory rating that Smith had ever received during his ten years as a teacher for the New York City Department of Education.

59.     In yet another attempt to put an end to the escalating course of discriminatory and retaliatory conduct against him, Smith consented to a medical examination on June 6, 2005. The examination occurred on June 21, 2005. The examination confirmed what Smith's physician had advised all along; i.e., that Smith was, in fact, disabled but nevertheless able to perform all of the functions of his job.

60.     Ignoring the DOE's own physician's recommendations, on or about August 18, 2005, Smith was placed on the Ineligible/Inquiry List and advised that he was going to be charged with insubordination, absenteeism, incompetence, and creating safety issues. As a result of this action, Smith can no longer perform any substantive duties for his current employer or seek a transfer.

61.     Immediately thereafter, Smith was pulled from the classroom and re-assigned to a disciplinary area known colloquially as "the rubber room."[6] In or around December of 2005, Smith was served with no fewer than twenty-seven (27) "specifications," nearly all of which were reported by Uehling. Although Smith is obviously slated for termination, he has had no hearing on the merits of this claim, despite his demands nearly a year later. Taxpayer money is being pilfered, while Smith remains stigmatized, deprived of his entitlement to pursue his livelihood, his personnel file "blocked" from consideration by prospective employers as of August 2005.

62.     It is worthy of note that, upon information and belief, Uehling was removed from her position for incompetence in or around June of 2005.

---

[6] Essentially a detention hall for wayward teachers awaiting disposition of disciplinary action against them. Smith, who exceeded the contractual allotment of absences due to his heart condition, has had the pleasure of sharing a table with an accused sex offender, brought up on charges after vacationing with his 14-year-old student and "girlfriend" in the Dominican Republic.

63.   On  or about May 2007,  Smith was in the process of a disciplinary hearing, upon which closing arguments were being had on May 10, 2007, when Kearney falsely reported to the arbitrator, Jack Tillem, that Smith had made threats against him(Tillem).

64.  This occurred because Smith had refused Kearney's wrongful request that Smith execute and agreement whereby Smith would agree to pay fees to Kearney to which he was not entitled.

65.   Smith refused to sign this agreement which Kearney had prepared, or to pay the amount demanded, and as a result thereof, Kearney threatened to not appear at closing arguments.

66.   Commencing at the end of April 2007 and continuing into May 9, 2007 Kearney began communicating with Smith by leaving voice mail messages and sending e-mails repeatedly threatening Smith that he would not appear on the final hearing date unless Smith paid fees to Kearney and his firm. His voice mail messages at this time and other times included profanity laced words.

67.   This occurred even after Kearney had advised Tillem on May 8, 2007 that Smith had threatened him (Tillem).

68.   Smith had previously forwarded to Tillem a letter expressing that Tillem had acted in a biased manner during those hearings, particularly when suggesting that Smith consent to a disposition of a three-to-six month suspension prior to hearing Smith's evidence.

69.  As a result of the false reporting of the threats against him, Tillem recused himself from the case.[7]

70. Subsequently, a new arbitrator was appointed, and Smith demanded a hearing de novo, which request was refused, except for a one day opportunity to present additional testimony.[8]

71.  Smith refused this opportunity, and as a result the charges were sustained and Smith received a one-year suspension without pay, a penalty Smith has since served.

72.  Upon completion of the suspension, Smith continued his tenure in the Rubber Room as a result of new charges having been filed on January 8, 2008 relating to the threats allegedly made against Tillem.

73.  Not being satisfied with merely charging Smith and having hearings regarding those charges, the DOE/SCI published on the internet and other outlets, a copy of the falsified SCI Report regarding the alleged incident involving Tillem, a report which was prepared without the SCI having asked Smith any questions or taken any testimony.

74.  Actually, Smith was interviewed in connection with the SCI report, under the subterfuge that the SCI was investigating grievances filed by Smith, when in fact, the SCI was investigating Smith all along.

---

[7] Tillem, as a result of the false reporting of the threats against him, agreed with Kearney's request to state for the record that he had recused himself as a result of Smith's letter accusing him of bias.  DOE attorney Susan Jalowski agreed.  After Tillem recused himself for that reason, Theresa Europe insisted in a telephone conference that Tillem give the real reason for his recusal, and that such recusal was based upon the false statement's of Kearney that Smith had threatened to harm Tillem.

[8] Prior to continuation of the arbitration, Smith was directed to attend a psychiatric evaluation because Smith had been accused of being a danger to others as result of the alleged threats. The evaluation took place on June 11, 2007. On July 11, 2007 a form was generated stating that there were no objective findings which would preclude Smith from returning to work. Although the DOE had accused Smith of being a danger to others, it nevertheless directed him to meet with the new arbitrator Howard Edelman on June 15, 2007, prior to receiving the results of the psychiatric examination, which presumably would have found Smith a danger to all of society.

75.    This report was published in order to defame Smith and end his educational career in New York City, or anywhere.

76.    A hearing upon these charges was held in or about May and June 2009, but no decision on those charges has yet been made.

77.    At the conclusion of those hearings, Smith remained confined to the Rubber Room, when additional charges were preferred in May 2009 by Darlene Miller, alleging a multitude of violations, and requiring yet another 3020(a) hearing.  In actuality, these charges were preferred during the May 2009 hearings which alleged excessive absences, when in fact, those absences were caused in large part by Smith's disability.

78.    These charges were preferred in order to keep Smith expending money to defend those charges, and to force him to resign his position with the DOE.

79.    Not satisfied with these efforts, the DOE has continued its crusade against Smith by wrongfully refusing to pay him, as required, for the time spent in the Rubber Room, falsely claiming that Smith owes the DOE for absences for which he had previously been paid, for periods going back in excess of three years.  Smith believes that the DOE even deducted amounts for periods for which Smith had already been suspended without pay, thereby double deducting  such compensation.

80.    In late June 2009, noting Smith's steady and consistent attendance record, the DOE failed to provide Smith with a proper time card with which to clock in.

81.    A new blank time card was provided which Smith used for a period of three days, after which Smith received an official time card which he used for the remainder of the month.

82.  When Smith was paid for June based only upon the newer unofficial time card which Smith had handwritten his name, the DOE denied that the official card existed and claimed that Smith had actually been absent for nearly the entire month of June.

83.  Smith's meager paycheck arrived and Smith complained about the June pay being improperly deducted and threatened legal action.

84.  Upon hearing of his complaints, the DOE miraculously found Smith's entire June time card, indicating that Smith had actually been present for the entire month of June.

85.  No explanation has ever been offered as to how this could have happened and the DOE has conceded that Smith should have been paid for the entire month of June.

86.  The entire episode herein was caused by Smith having properly complaining to the DOE about improper class sizes far in excess of that permitted under the UFT Contract, a condition which the DOE has expressly acknowledged does in fact exist, and did exist regarding Smith's classes.

87.  The DOE continued to distinguish itself in the area of legal ethics when it falsely misled the Court when it stated in the Appellate Division First Department that Smith had made homicidal threats against Tillem which were substantiated in the falsified SCI report, when it knew that the hearing on those charges has not yet been completed and no findings made.


### AS AND FOR A FIRST CAUSE OF ACTION
(Violation of Titles I, II and V of the Americans with Disabilities Act as Against the DOE)

88.  The Plaintiff incorporates by reference paragraphs "1" through "87" of the complaint as if such paragraphs were fully reinstated herein.

89.    Plaintiff Smith has been a teacher with the Department of Education since 1995. Smith performed extremely well in this capacity and received positive evaluations for approximately ten (10) years.

90.    Despite his excellent performance, Smith has suffered from paroxysmal atrial fibrillation and accompanying atrial flutter, a disability under the ADA.

91.    The DOE has been aware of Plaintiff's disability since the inception of his employment.

92.    When Smith requested the reasonable accommodation of no more than the *maximum* class-size limit for his physical education classes, the DOE denied his requests and instead began a campaign of discrimination and retaliation against him, including, but not limited to, disparate overbearing supervision, contrived negative performance evaluations, false letter or reprimand, threats of termination and harassment.

93.    When Smith requested, as a reasonable accommodation, minor scheduling changes to accommodate his medical treatment, the DOE launched an investigation into the existence of Smith's disability. When the DOE's own physicians confirmed the existence of Smith's disability, the DOE chose instead to institute proceedings against Smith for his alleged failure to cooperate with an examination to which he already had submitted himself and falsely accused him of incompetence, insubordination and improper conduct.

94.    Because of his disability, Smith has been placed on the ineligibility list, exiled to the "rubber room" and is currently scheduled to be terminated.

95.    The DOE's refusal to grant Smith reasonable accommodation and the pattern of discriminatory treatment against him were intentional acts, motivated by ill will and

discriminatory animus and calculated to deprive him of his livelihood and his due process in the context of his tenured employment.

96.    By reason thereof, the DOE has violated the Americans with Disabilities Act and has caused plaintiff to suffer damages, including loss of past and future earnings, damage to his business reputation, his marketability, employment benefits, and emotional injuries.

**WHEREFORE,** Plaintiff respectfully demands judgment as against the DOE in an amount to be determined at trial, but in no event less than Five Hundred Fifty Thousand Dollars ($550,000.00) in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A SECOND CAUSE OF ACTION</u>
(Violation of New York Civil Service Law §75-b (Whistleblower Law) Against the DOE)

97.    The Plaintiff incorporates by reference paragraphs "1" through "48" of the complaint as if such paragraphs were fully reinstated herein.

98.    The New York City Department of Education is an employer as defined by  New York Civil Service Law § 75-b(1)(a)(iii).

99.    Smith is a public employee as defined by New York Civil Service Law § 75-b(1)(b).

100. On or about December 22, 2004, Smith forwarded a letter to Lindley Uehling, Principal of New York City Museum School advising her of certain violations and non-compliance of certain City and State regulations regarding class size.

101.   On or about December 31 2004, Smith forwarded a copy of the December 22, 2004 letter to Lindley Uehling, Principal of New York City Museum School to Peter Heaney, Jr., former Regional Superintendent of the DOE, and Michael A. LaForgia, at the time the local

Instructional Superintendent advising them of certain violations and non-compliance of certain City and State regulations regarding class size.

102. As a result thereof, the employer took disciplinary or other adverse personnel action against the plaintiff, regarding the employee's employment because the plaintiff disclosed "to a governmental body (The DOE) information regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the to the public health or safety…" as provided by New York Civil Service Law § 75-b(2)(b)(i).

103. The retaliatory conduct and/or other personnel action is outlined throughout this complaint and includes but is not necessarily limited to a campaign of discrimination and retaliation against him, including, but not limited to, disparate overbearing supervision, contrived negative performance evaluations, false letter or reprimand, threats of termination, the filing of false charges and harassment, all contrary to the provisions of *New York Civil Service Law 75-b et seq*.

**WHEREFORE,** Plaintiff respectfully demands judgment as against defendants in an amount to be determined at trial, but in no event less than One Million Dollars ($1,000,000.00) in compensatory damages; non-economic damages in the amount of One Million Dollars ($1,000,000.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest' and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>
(Retaliatory Hostile Work Environment in Violation of the ADA as Against All DOE Defendants)

104. Smith repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "103" with the same force and effect as if fully set forth herein.

105.    By virtue of the acts as set forth above, defendants retaliated against Plaintiff as a direct result of his request for reasonable accommodation by engaging in disparate overbearing supervision, contrived negative performance evaluations, false letters of reprimand, threats of termination and harassment and the filing of false charges. In addition, the defendants have placed Smith on the Ineligibility List, falsely accused Smith of incompetence, insubordination and improper conduct, exiled him to the "rubber room" and have slated him for termination.

**WHEREFORE,** Plaintiff respectfully demands judgment as against defendants in an amount to be determined at trial, but in no event less than One Million Dollars ($1,000,000.00) in compensatory damages; non-economic damages in the amount of One Million Dollars ($1,000,000.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest' and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>
(Age Discrimination In Violation of the ADEA as Against All DOE Defendants)

106.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "105" with the same force and effect as if fully set forth herein at length.

107.    Plaintiff was over the age of Forty (40) when he suffered disparate overbearing supervision, contrived negative performance evaluations, false letters of reprimand and threats of termination and harassment. In addition, Smith was placed on the Ineligibility List, falsely accused of incompetence, insubordination and improper conduct, exiled to the "rubber room" and is slated for termination.

108.    Plaintiff's age was an impermissible factor in the adverse employment decisions enumerated above.

109.    Similarly situated younger employees (i.e. those with equivalent job duties and similar performance reviews) did not experience comparable treatment to that of the Plaintiff.

27

110.    The ADEA prohibits discrimination on the basis of age.

111.    As a direct result of this discriminatory disparate treatment, Plaintiff suffered injury and harm.

**WHEREFORE,** Plaintiff respectfully demands judgment as against defendants in an amount to be determined at trial, but in no event less than Five Hundred Fifty Thousand Dollars ($550,000.00) in compensatory damages; non-economic damages in the amount of Three Hundred Thousand Dollars ($300,000.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A FIFTH CAUSE OF ACTION</u>
(Retaliatory Hostile Work Environment in Violation of the ADEA as Against All Defendants)

112.    Smith repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "111" with the same force and effect as if fully set forth herein.

113.    By virtue of the acts as set forth above, defendants retaliated against Plaintiff as a direct result of his complaints concerning age discrimination by engaging in disparate overbearing supervision, contrived negative performance evaluations, false letters of reprimand, the filing of false charges, threats of termination and harassment. In addition, the defendants have placed Smith on the Ineligibility List, falsely accused Smith of incompetence, insubordination and improper conduct, exiled him to the "rubber room" and have slated him for termination.

**WHEREFORE,** Plaintiff respectfully demands judgment as against defendants in an amount to be determined at trial but in no event less than Five Hundred Fifty Thousand Dollars ($550,000.00) in compensatory damages; non-economic damages in the amount of Three Hundred Thousand Dollars ($300,000.00); the costs and disbursements of this action, including

reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR A SIXTH CAUSE OF ACTION
(Violation of New York Labor Law § 201(d) As Against All DOE Defendants)

114.    Smith repeats, realleges and reiterates each and very allegation set forth in paragraphs "1" through "113" with the same force and effect as if fully set forth herein.

115.    New York Labor Law § 201(d)(2)(d) prohibits workplace discrimination, adverse employment decisions and disparate treatment based on membership or affiliation with a union or labor organization or for participation in activity protected under the NLRA.

116.    In this case, Smith's status as a member of the UFT, his insistence that management abide by the terms of the collective bargaining agreement in place with the UFT and his initiation of grievance proceedings are protected legal activities under § 201(d) of the Labor Law.

117.    Despite his legally protected status as a member of the UFT and as a direct result of his exercise of lawfully protected activities in connection therewith, Smith was harassed, threatened, disparaged, defamed and brought under termination proceedings. These actions were not visited upon similarly-situated employees who did not participate in grievance proceedings and did not insist that management abide by the terms of the CBA; all in contravention of § 201(d)(2)(d).

118.    Such negative employment actions and harassment arose from Smith's status as an active union member and his lawful participation in labor activities.

119.    As a direct result of defendants' discriminatory treatment of Smith in flagrant violation of § 201(d) of the Labor Law, including, but not limited to engaging in disparate overbearing supervision, contrived negative performance evaluations, false letters of reprimand,

29

threats of termination, filing of false charges, and harassment, the placement of Smith on the

Ineligibility List, falsely accusing Smith of incompetence, insubordination and improper

conduct, exiling him to the "rubber room" and the institution of proceedings against him,

Plaintiff suffered injury and harm including, but not limited to, loss of past and future income,

damage to his business reputation and marketability, and emotional injuries.

      **WHEREFORE,** Plaintiff respectfully demands judgment as against Defendants in an

amount to be determined at trial, but in no event less than Five Hundred Fifty Thousand Dollars

($550,000.00) in compensatory damages; the costs and disbursements of this action, including

reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court

deems just and proper.

<u>AS AND FOR A SEVENTH CAUSE OF ACTION</u>
(Conspiracy to Violate New York Labor Law § 201(d) as Against the DOE and the Named
Defendants in their Individual Capacities)

      120. Smith repeats, realleges and reiterates each and every allegation set forth in

paragraphs "1" through "119" with the same force and effect as if fully set forth herein.

      121.    New York Labor Law § 201(d)(2)(d) protects individuals from workplace

discrimination, adverse employment decisions and disparate treatment based on membership or

affiliation with a union or labor organization or for participation in activity protected under the

NLRA.

      122.    In this case defendants conspired and agreed, by words and conduct, to harass,

threaten, disparage, defame and institute termination proceedings as a direct result of Smith's

insistence that management abide by the terms of the collective bargaining agreement in place

with the UFT and his initiation of UFT grievance proceedings, protected legal activities under §

201(d) of the Labor Law.

123.    As a direct result of defendants' conspiracy to violate § 201(d) of the Labor Law, manifesting itself in actions including, but not limited to, disparate and overbearing supervision, contrived negative performance evaluations, false letters of reprimand, threats of termination and harassment, placement of Smith on the Ineligibility List, falsely accusing Smith of incompetence, insubordination and improper conduct, exiling Smith to the "rubber room" and the institution of proceedings against him, Smith has suffered injury and harm including, but not limited to, loss of past and future income, damage to his business reputation and marketability, and emotional injuries.

124.    Further, Defendants' conduct was intentional, malicious and contrary to public policy, and warrants an assessment of punitive damages.

**WHEREFORE,** Plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Five Hundred Fifty Thousand Dollars ($550,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Three Million Dollars ($3,000,000.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR A EIGHTH CAUSE OF ACTION
(Disability Discrimination in Violation of the New York Executive Law §296 and New York City Administrative Code §§ 8-107 & 8-502 As Against All DOE Defendants)

125.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "124" with the same force and effect as if fully set forth herein at length.

126.    Plaintiff suffered a disability within the meaning of § 296 of the Executive Law and §§ 8-107 and 8-502 of the New York Administrative Code in that his condition and subsequent treatment impaired a normal bodily function.

127.    Defendants engaged in a pattern of discrimination against Plaintiff because of his disability, including, but not limited to, harassment, contrived negative performance reviews, manufactured letters of reprimand, placement on the ineligibility list, institution of proceedings against Smith for false allegations of incompetence and relegation of Smith to the "rubber room."

128.    By reason of the acts of discrimination detailed herein, Defendants have violated New York Executive Law § 296 and New York City Administrative Code §§ 8-107 and 8-502, and have caused Plaintiff to suffer damages, including but not limited to, loss of past and future income, damage to his business reputation and marketability, and emotional injuries.

129.    Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, Plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Five Hundred Fifty Thousand Dollars ($550,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Three Million Dollars ($3,000,000.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR AN NINTH CAUSE OF ACTION
(Age Discrimination In Violation of New York Executive Law § 296 and New York City
Administrative Code § 8-107 & 8-502 As Against All DOE Defendants)

130.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "129" with the same force and effect as if fully set forth herein at length.

131.    Plaintiff was over the age of Forty (40) when he suffered disparate and overbearing supervision, contrived negative performance evaluations, false letters of reprimand,

threats of termination and harassment, the filing of false charges,  placement on the Ineligibility List, false accusations of incompetence, insubordination and improper conduct, exile to the "rubber room" and the institution of proceedings against him.

132.    Plaintiff's age was an impermissible factor in the decision to discriminate against him.

133.    Similarly situated younger employees (i.e. those with equivalent job duties and similar performance reviews) did not experience comparable treatment to that of the Plaintiff.

134.    New York Executive Law § 296 and New York Administrative Code  §§ 8-107 & 8-502 prohibit discrimination on the basis of age.

135.    As a direct result of this discriminatory treatment, Plaintiff suffered injury and harm.

136.    Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

**WHEREFORE**, Plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Five Hundred Fifty Thousand Dollars ($550,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Three Million Dollars ($3,000,000.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A TENTH CAUSE OF ACTION</u>
(Retaliation In Violation of New York Executive Law § 296 and New York City Administrative
Code § 8-107 & 8-502 As Against All DOE Defendants)

137.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "136" with the same force and effect as if fully set forth herein at length.

138.    Defendants engaged in acts of retaliation, including harassment, false poor performance reviews and manufactured letters of reprimand as a direct result of Plaintiff's opposition to, and complaints concerning, the age and disability discrimination that defendants perpetrated against him.

139.    New York Executive Law § 296 and New York City Administrative Code § 8-107 & 8-502 prohibit acts of retaliation in response to an employee's filing or communication of a complaint or charge of improper discrimination as Plaintiff did herein, and have caused Plaintiff to suffer damages, including but not limited to, loss of past and future income, damage to his business reputation and marketability, and emotional injuries.

140.    Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

**WHEREFORE,** Plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Five Hundred Fifty Thousand Dollars ($550,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Three Million Dollars ($3,000,000.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A ELEVENTH CAUSE OF ACTION</u>
(Libel As Against All DOE and SCI Defendants)

141.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "140" with the same force and effect as if fully set forth herein at length.

142.    Defendants knowingly, intentionally and maliciously circulated false written statements that Smith was "incompetent," "unprofessional," and "irresponsible." Specifically, on April 5, 2005, a false letter of reprimand was placed in Smith's personnel file and distributed to

34

others in the DOE. Additionally, DOE officials have represented to Smith that his personnel file contains reports of Smith "faking" his illness, although the DOE has continuously refused to hand over such reports to Smith.

143.   Additionally, in or about October 2007, the DOE/SCI intentionally and maliciously published on the internet and other major media outlets, the entire copy of the SCI's falsified report, although no hearings regarding the allegations contained in that report had been held, nor had Smith had the opportunity to see the report or challenge its findings.

144. Defendants wrote and disseminated said false statements with malice, and with knowledge of their falsity or in reckless disregard for the truth or falsity of such statements, in an effort to discredit Smith and to discriminate and retaliate against Smith.

145.   Defendants intended that the statements would circulate by way of Smith's personnel file to other prospective employers, to administrators supervising Smith in order to achieve the purpose of discrediting and retaliating against Plaintiff in the exercise of his lawful activities.

146.   Defendants in fact published circulated the false statements to third parties.

147.   Numerous third parties, both inside and outside of the DOE read Defendants' false statements concerning the Plaintiff.

148.   Defendants' statements were libelous *per se*.

149.   As a direct result of Defendants' false and defamatory statements, Smith has suffered damages, including but not limited to, loss of future income, damage to his business reputation and marketability, reduced prospects for employment and emotional  and physical injuries.

150.    Defendants' conduct was intentional, malicious and contrary to public policy, and warrants an assessment of punitive damages.

**WHEREFORE**, Plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Three Million Dollars ($550,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Five Million Dollars ($3,000,000.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR AN TWELFTH CAUSE OF ACTION
(Violation of Due Process Under Color of State Law In Violation of Sections 42 U.S.C. § 1983
As Against the DOE Defendants)

151.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "103" with the same force and effect as if fully set forth herein at length.

152.    By virtue of the acts detailed above, Defendants violated the mandates of 42 U.S.C. § 1983 by stigmatizing and disparaging Plaintiff with outrageous allegations of incompetence, intentionally blocking access to Plaintiff's personnel file by prospective employers and depriving the Plaintiff of his right to work in his chosen profession---by casting him out to the rubber room---without a hearing,  and by denying Plaintiff the compensation to which he is properly entitled, also without a hearing.

153.    As a direct and proximate result of defendants' actions, Plaintiff has suffered damages in the form of past and future income, damage to his business reputation and marketability, emotional injuries due to extreme harassment.

154.    Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

**WHEREFORE,** Plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Three Million ($3,000,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Five Million Dollars ($5,000,000.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## <u>JURY DEMAND</u>

155.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial on each and every issue in this action.

Dated: Nyack, New York
        January 10, 2010

/S/_____
Robert S. Lewis (RSL 3026)
*Attorney for the Plaintiff Theodore Smith*
53 Burd St.
Nyack, New York 10960
(845) 358-7100

William A. Gerard, Esq.(WAG  )
Of Counsel
71 Woods Rd.
Palisades, New York 10964
(845)365-3121